IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDGAR MITCHELL, et al.                :          CIVIL ACTION
                                      :
        v.                            :          No. 05-4073
                                      :
MG INDUSTRIES, INC., et al.           :

## MEMORANDUM

**Juan R. Sánchez, J.**                          **September 30, 2011**

Plaintiffs Edgar Mitchell, John Muller and Joseph Cherneski bring employment discrimination claims against Messer Griesheim Industries, Inc./ALIG LLC (MG), and its three successors in interest, L'Air Liquide S.A., Air Liquide Industrial U.S. LP, and Air Liquide Large Industries U.S. LP, pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626 *et seq.* and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 961 *et seq.* Plaintiffs allege MG discriminated against them on the basis of age by not inviting them to participate in a one-time investment opportunity MG offered to certain of its employees in October 2001.  In addition, Muller alleges MG retaliated against him for filing ADEA charges with the Equal Employment Opportunity Commission (EEOC) by denying him severance benefits.

Defendants ask this Court to grant summary judgment in their favor on all claims, asserting Plaintiffs' discrimination claims are time-barred and are legally insufficient in any event because MG's failure to invite Plaintiffs to participate in the investment opportunity was not an adverse employment action.  As to Muller's retaliation claim, Defendants assert it is not unlawful retaliation to abide by a uniform policy which requires those employees entitled to severance benefits to sign a general release of all claims in exchange for the severance.

1

For the following reasons, Defendants' motion will be granted in its entirety.

**FACTS[1]**

In 2001, MG was owned by Messer Griesheim GmbH (Messer), a worldwide industrial gas company headquartered in Germany.  In April 2001, Allianz Capital Partners (Allianz) and Goldman Sachs (Goldman) became major shareholders of Messer.  Their interest was in seeing their investment in Messer increase in value over the next several years, and their intention was to sell their Messer shares in three to seven years.  On October 1, 2001, as an incentive to improve Messer's overall profitability and to enhance MG's value and ability to retain certain employees to ensure MG achieved its financial objectives for the sale, MG, through Messer, invited a number of its employees by e-mail to participate in a one-time discretionary investment opportunity, the Messer Investment Program (MIP).  The MIP was intended "to increase the motivation and retention of [MG's] management team" by offering "a select group of managers an opportunity to participate in the Company's success by becoming stockholders of the Company."  Roll-Out Workshop Management Investment Program (MIP) Handout.  Messer advised MG's President, James Doerr, that the program was an opportunity to be offered to employees (managerial or not) who "would be critical to making or achieving the financial objectives of the company."  Pls.' Resp. 14.  An employee could be "critical" even if no one reported to him or her.  Pls.' Resp. 14.

Doerr charged MG's General Counsel and Vice President of Human Resources, James Anderson, with oversight of the selection process.  Anderson, assisted by MG's Director of

---

[1] When considering a motion for summary judgment, a district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997).

Human Resources, Mike Savage, was to ensure the selection criteria were consistently applied and compliant with anti-discrimination and equal opportunity laws.  General Managers (GMs) of each of MG's five divisions, and the Vice Presidents who reported to them were automatically invited to participate in the MIP.  Each of the five GMs was then to propose additional candidates for participation from within their respective divisions.  Thus, for the Bulk Products Division, in which all three Plaintiffs were employed as sales representatives, GM Wayne Harman, was responsible for recommending candidates for the MIP.  Harman could have consulted with his direct report, David Esposito, the Vice President within the Bulks Products Division, regarding the selection process; however, there is no evidence Harman ever did so. Although the selection of additional candidates was essentially a group decision among the five GMs, the GMs generally deferred to each other's recommendations regarding the proposed candidates from within their respective divisions.

In deciding whom to recommend for the MIP within the Bulks Products Group division, Harman used his own discretion and based his decisions on his own personal judgment and understanding of what the various business units within the Division were doing, each employee's responsibilities and experiences, and the ultimate goals of the MIP strategic plan. Harman testified he "identified the skill sets and positions [he] felt were most critical and created a list."  Harman Dep. at 141:8-9.  He also conducted "contingency planning" for individuals who could readily fill positions "should some absences occur later on that needed to be filled, so [he] had the people executing today as well as some bench strength to draw on . . . ."  *Id.* at 141:10-16.  Importantly, Harman felt sales representatives such as Plaintiffs could not significantly impact his division's profitability with respect to the MIP's overall three to seven year timeframe because MG's bulk products customers were generally subject to long-term contracts with

seven-year terms.   As a result, Harman recommended only one bulk products sales representative who "had been in applied technology,[2] [and] . . . had leverageable skills that the corporation could use in other roles beyond what he was currently doing as a contingency plan for what we might need to achieve . . . over the next three to five years." *Id.* at 305:15-22.

The MIP was entirely voluntary, as it came with significant requirements and also carried significant risk.  Those who opted to participate in the MIP were required to invest a minimum amount equal to one-third of their annual salary, which would be used to purchase Messer stock. The investment amount had to be paid in cash, and each participant was required to use personal funds.  Moreover, participants had to decide whether to make this appreciable cash outlay by January 1, 2002 – mere weeks after the program's announcement – which coincided with the period of high market volatility in response to the events of September 11, 2001.  Messer shares purchased through the MIP could not be sold, and the investment, therefore, could not be liquidated until there was an "exit" event in which Allianz and Goldman sold their Messer shares.  If a participant were to retire prior to such an event, the participant would receive the pro-rated fair market value of his shares as of the time of retirement, although payment would not be received until the time of the exit event.  The purchase price was denominated in Euros, as Messer was based in Germany, so returns to U.S. participants could be adversely impacted by currency fluctuations.  Participants were warned that the program was at their own risk; there was no guaranteed return on the MIP.  Of the 70 employees who were offered the opportunity to

---

[2] The Applied Technology Group was a specialized group of engineers, which Harman believed "had an enhanced impact on increasing [Earnings Before Interest, Taxation, Depreciation and Amortization (EBITDA)]."  Harman Dep. at 293:18 – 294:5.

invest in MG's stock, only about half – 34 – elected to participate.  The investment made MIP participants direct shareholders in the company.

As a matter of company policy, the financial information and program details of the MIP were to be kept confidential and were not to be openly discussed with employees who were not selected for the program.  According to Doerr, "like any benefit program or salary or bonus, . . . it was between the company and the individual."  Doerr Dep. 377:19-21.  Accordingly, a special informational meeting was held off premises at a nearby hotel on October 8, 2011 for the selected employees.  Notwithstanding MG's efforts to keep the MIP confidential, by October 4, 2001, just three days after the invitation email was sent, Mitchell called Muller to ask him what he knew about the so-called MIP.  By October 11, 2001, the two men learned the MIP was an investment program, knew the names of some of the invitees, were aware a meeting had been held for those invited to participate, and by default, knew they had not been selected to participate in the MIP.

In 2004, the "exit" event occurred when the stock of Messer, MG's parent company, was sold to a French industrial gas company.  MIP participants profited from the sale.

On May 12, 2004, Plaintiffs each filed a Charge of Discrimination with the EEOC and the PHRC, and subsequently received a Notice of Right to Sue from the EEOC.  On July 29, 2005, Plaintiffs filed the instant suit, alleging their non-selection for the MIP based on age constituted an adverse employment action in violation of the ADEA and the PHRA.  Muller filed his separate claim for retaliation on the same date, alleging he was denied his severance benefits in retaliation for filing his ADEA complaint.

## DISCUSSION

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat such a motion, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation and internal punctuation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Id.*

Defendants first argue they are entitled to summary judgment because Plaintiffs knew about the MIP in October 2001, within days after it was announced, yet failed to file charges with the Equal Employment Opportunity Commission (EEOC) within the prescribed 300 days, instead filing charges more than 950 days later on May 12, 2004. Plaintiffs agree Mitchell and Muller were aware of the MIP "more than 300 days before they filed charges with the EEOC," Pls.' Sur-Reply 3, but argue their claims are nevertheless timely because neither of them became aware of the alleged reason why they were not selected for the MIP – their age – until Fall 2003, shortly after which they filed their EEOC charges. With respect to Cherneski, Plaintiffs assert he was not aware of the existence of the MIP in any manner until Fall 2003 and, therefore, his EEOC charge was timely filed.

6

To preserve a claim under the ADEA and the PHRA,[3] a plaintiff must first file a charge of discrimination with the EEOC within 300 days after the allegedly unlawful practice occurred before filing a claim in federal court.  20 U.S.C. § 626(d)(2); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir. 1994).  The 300-day filing requirement is analogous to a statute of limitations.

The discovery rule functions to delay the initial running of the statutory limitations period in employment discrimination cases, but only until the plaintiff has discovered or, by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct.  *Oshiver*, 38 F.3d at 1386; *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124 (3d Cir. 1997).  As a general rule, the statute of limitations begins to run when the potential claimant's cause of action accrues. *Oshiver*, 38 F.3d at 1385.  The accrual date is not necessarily the date on which the wrong that injures the potential claimant occurs, but the date on which the potential claimant *discovers* he or she has been injured.  *Id.*; *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (stating limitations period begins to run when plaintiff "knew or should have known of the injury upon which its action is based" (internal citation omitted); *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir. 1988).  The determination of when a claim accrues is an objective inquiry turning on

---

[3] PHRA claims are treated consistently with claims brought under federal anti-discrimination statutes as the analytical framework of an action under the PHRA is essentially identical to that of a claim under the ADEA.  *See Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).  In *Fogelman*, the Third Circuit held, "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  283 F.3d at 567 (citation omitted).  As the parties have not identified any language in the PHRA that would justify different treatment in this matter, Plaintiffs' ADEA and PHRA claims will be evaluated using an identical analysis.

"not what the plaintiff actually knew but what a reasonable person should have known." *Kach*, 589 F.3d at 634.  A cause of action may accrue "even though the full extent of the injury is not then known or predictable." *Id.* at 634-35.  Significantly, it is the "awareness of *actual* injury, not . . . awareness that this injury constitutes a *legal* wrong" that determines when a claim accrues under the discovery rule. *Craig v. Thomas Jefferson Univ.*, No. 08-4165, 2009 WL 2038147, at *6 (E.D. Pa July 7, 2009) (quoting *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 590-91 (3d Cir. 2005)).

Here, the record shows that Mitchell and Muller were undoubtedly aware of the MIP as early as October 4, 2001, when Mitchell called Muller to notify him of the MIP.  This phone call and the additional information Mitchell and Muller learned about the MIP in the following days was memorialized by Muller in his own notes, dated October 11, 2001, and entitled, INVESTMENT OPPORTUNITIES IN MESSER.  Specifically, Muller noted there had been a "'special meeting' representing a 'select' group to be offered an investment opportunity in Messer." Defs.' Mot. Summ. J., Exh. BB.  Mitchell and Muller concede they were aware of the MIP "more than 300 days before they filed charges with the EEOC."  Pls.' Sur-Reply 3.  Mitchell and Muller were also aware that approximately 70 employees had been selected to participate in the MIP.  Indeed, Mitchell and Muller could even identify certain of those 70 employees.  By default, they were also aware they had not been selected, prompting Muller to write in his notes, "[t]here is no question in my mind ***that I was discriminated against*** by not being made aware of this opportunity initially and given the opportunity to participate." (emphasis added).  Defs.' Mot. Summ. J., Exh. BB.

Given these facts, the discovery rule could at most apply to toll the statute of limitations from October 1, 2001, the date the email was sent to the invitees of the MIP, to October 11,

2001, the date of Muller's notes, at which point both Mitchell and Muller were aware that an alleged discriminatory employment action had occurred.  Indeed, there appears to be no other purpose for Muller's October 11 notes than to document the alleged discriminatory act to support a future claim.  Despite this knowledge, Mitchell and Muller did not file their charges with the EEOC until May 12, 2004, more than two full years later.

Mitchell and Muller contend the doctrine of equitable tolling should apply to save their claims because MG actively misled them into missing the deadline for filing their claim.   Pls.' Resp. 63.  Mitchell and Muller reason, although they knew they had not been selected for the MIP (*i.e.*, that they suffered *actual* injury) more than 300 days before the EEOC charges, they did not know, and could not have known, their age motivated their non-selection (*i.e.*, that they suffered *legal* injury) until August or September 2003 because of MG's active misrepresentations to them.[4]

A plaintiff seeking equitable relief from a statute of limitations must establish: (1) the defendant actively misled the plaintiff respecting the plaintiff's cause of action; and (2) this deception caused the plaintiff's non-compliance with the limitations provision.  *Oshiver*, 38 F.3d at 1387; *see also Lutz v. Philips Elecs. N. Am. Corp.*, 347 F. App'x 773, 777 (3d Cir. 2009) (explaining a plaintiff seeking the benefit of equitable tolling must establish "(1) material misrepresentation or fraudulent concealment; (2) reasonable and detrimental reliance upon the misrepresentation or concealment, and (3) extraordinary circumstances").  Plaintiffs thus ask this

---

[4] Plaintiffs allege MG lied to them about the existence of the MIP and about who was selected and how the selection process was conducted.  Muller testified the possibility that his exclusion from the MIP may have been age-related discrimination did not occur to him until he heard a comment made by Mike Vandergriff, a regional logistical manager, in late August or September 2003 allegedly suggesting same.  Plaintiffs do not allege that Vandergriff played any role in the MIP selection process.

Court to apply the equitable tolling doctrine until the time they became aware of their *legal* injury rather than the date they became aware of their *actual* injury.  Such a rule contravenes Third Circuit precedent.

Mitchell's and Muller's causes of actions accrued when they learned of their non-selection for the MIP (their actual injuries), not upon their awareness of any alleged discriminatory motivation.  The equitable tolling doctrine cannot toll the statute of limitations beyond the date of a plaintiff's actual knowledge of the injury giving rise to the claim.  *Lutz*, 347 F. App'x at 777.  Moreover, the discovery rule only tolls the statute of limitations until the date a potential claimant discovers the actual injury, not the legal injury.  *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990).  As a result, because Plaintiffs Mitchell and Muller were aware of the underlying facts supporting their claim by October 11, 2001 (at the latest), they cannot avail themselves of either doctrine.  *Bailey v. Viacom, Inc.*, Nos. 10-3236, 10-3237, 10-3238, 2011 WL 2419915, at *4 (3d Cir. June 16, 2011); *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 306 (3d Cir. 1983).[5]

Cherneski separately asks this Court to apply the discovery rule to his claims, arguing because he did not learn of the MIP until Fall 2003, his filing with the EEOC on May 12, 2004

---

[5] Mitchell's and Muller's claims are also not saved by the "single filing rule," under which non-complying plaintiffs may "piggyback" onto a timely filed claim if the non-complying plaintiffs could have filed their own charges at the time the complying plaintiff filed his or her charge. *Ahamaddiya v. Westinghouse Elec. Corp.*, No. 91-2468, 1992 WL 246087, at *4 (E.D. Pa. Sept. 17, 1992).  Mitchell and Muller argue Cherneski's claim was timely and, therefore, they can piggyback onto his claim.  Because Mitchell and Muller could not have filed their own charges at the time Cherneski filed his claim, even assuming Cherneski's claim was timely filed, the "single filing rule" does not apply to them.

In addition, Plaintiffs' last-ditch effort to save their claims based on the Lilly Ledbetter Fair Pay Act of 2009 fails as well, because Plaintiffs' claims are not pay compensation discrimination claims and, therefore, the Act does not apply.  *Noel v. Boeing Co.*, 622 F.3d 266, 271 (3d Cir. 2010).

was timely.  Although Defendants allege Mitchell and Muller also spoke to Cherneski about the MIP and their collective non-selection for the program in October 2001 – the same time Mitchell and Muller admit they spoke to one another about the MIP – the record does not support this claim.  The record reveals Mitchell did not recall exactly when he spoke to Cherneski about the MIP, but he did not believe it was in October 2001.  Defendants argue because Mitchell admits he, Muller and Cherneski were "very close friends," and because Mitchell testified he talked to both Muller and Cherneski upon learning additional information about the MIP at later dates,[6] Cherneski "could have (and should have) known of his exclusion from the MIP in October 2001."  Defs.' Reply Br. 3.  The record is not clear, however, as to whether Cherneski should have been aware of the existence of the MIP at an earlier date, particularly given Doerr's testimony that he would not be surprised if there were employees who had not been selected who knew nothing about the program.  Doerr Dep. at 370:17-21.

Consequently, there is a genuine issue of material fact with respect to when Cherneski discovered the alleged injury – whether Cherneski learned about the MIP in October 2001, as Defendants assert, or later, in September 2003, as Cherneski claims.  For this reason, the Court does not find Cherneski's claims are necessarily time-barred.

---

[6] At his deposition, Mitchell was asked whether he would have spoken to anyone besides Muller regarding a December 2002 conversation with David Esposito, wherein Mitchell confronted Esposito about the MIP and its selection process, and Esposito told Mitchell he had nothing to do with it.  Mitchell responded: "Yes, I would have.  Again, I would have told – they actually grew up together and had a great feeling for one another.   I would have told Joe Cherneski."  Mitchell Dep. at 79:14-17.  However, Mitchell did not recall exactly when he spoke to Cherneski.
Mitchell again testified he would have spoken to Cherneski in 2003 upon receiving a list of the MIP invitees from Muller, explaining, "I would think I would have done that as a matter of course since all three of us are very close friends, been with the company a long time and so forth, just to share what I had learned with him."  Mitchell Dep. at 71:23 - 72:7

Regardless of whether any of the Plaintiffs' discrimination claims were timely filed, summary judgment is still warranted because non-selection for an invitation to participate in the MIP does not constitute an adverse employment action.  Thus, Plaintiffs cannot demonstrate they were discriminated against because of their age pursuant to the ADEA and PHRA.

The ADEA makes it "unlawful for an employer . . . to fail or otherwise refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To prove a prima facie case of age discrimination under the ADEA, Plaintiffs must establish they were: (1) over forty years of age; (2) qualified for the position at issue; (3) subject to an adverse employment action; and (4) ultimately replaced by a "sufficiently younger person."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Anderson v. CONRAIL*, 297 F.3d 242, 249 (3d Cir. 2002).

The parties agree Plaintiffs were all over 40 in 2001 and, therefore, belong to the protected class under the ADEA.  Defendants argue, and this Court agrees, Plaintiffs have failed to prove a prima facie case of age discrimination, however, because they cannot establish the third element, namely that they suffered an adverse employment action when they were not selected to participate in the MIP, the discretionary one-time investment program.

The Third Circuit has defined an adverse employment action as one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  In their motion, Defendants assert the MIP was a "discretionary investment opportunity akin to a stock option program" and the non-selection of an employee to participate in the MIP "had no effect upon one's salary, job

12

responsibilities, or any other incident of employment." Defs.' Mot. Summ. J. 31. As a result, Defendants argue the MIP does not constitute an adverse employment action.

The Third Circuit has not addressed the precise question of whether non-selection for a one-time discretionary investment opportunity, such as the MIP, amounts to an adverse employment action, however, other courts have found that denial of similar such discretionary income is not. In *Hottenroth v. Village of Slinger*, for example, the Seventh Circuit held a supervisor's failure to recommend an employer for certification as a journeyman-lineman did not constitute an adverse employment action because this benefit was wholly within an employer's discretion to deny or grant to the employee, was not a component of the employee's compensation, terms, conditions or privileges of employment, and could not be considered an entitlement. 388 F.3d 1015, 1033 (7th Cir. 2004) (quoting *Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 972 (7th Cir. 2001)); *see also Douglas v. Jackson*, No. 04-00847, 2007 WL 891349, at *3 (D.C. Cir. Mar. 22, 2007) (holding failure to nominate black employee for Presidential Rank Award was analogous to performance evaluation, and criticism of an employee's performance unaccompanied by a change in position or status does not amount to an adverse employment action); *Sicher v. Merrill Lynch*, 2011 WL 892746, at *3 (N.D Ill. Mar. 9, 2011) (holding "an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled.").

Consistent with this premise, the Third Circuit, in *Tucker v. Merck & Co.*, granted summary judgment when it determined the plaintiff was not subject to an adverse employment action where his negative performance evaluations had no impact on his compensation or terms of employment. 131 F. App'x 852, 857 (3d Cir. 2005). Quoting the Seventh Circuit, the Third Circuit went so far as to state, "even a negative evaluation that leads to a lower than expected

merit wage increase or bonus probably does not constitute an adverse employment action." *Id.* (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996); *EEOC v. Wyeth Pharm.*, No. 03-2967, 2004 WL 503417, *2  n.3 (E.D. Pa. Mar. 11, 2004)).[7]

Similarly, in *Seldon v. Nat'l R.R. Passenger Corp.*, the plaintiff sued her former employer for discrimination when it did not select her for a pilot work-from-home program.  No. 05-4165, 2007 WL 3119976 (E.D Pa. Oct. 24, 2007).  Granting the defendant's summary judgment motion, this court stated, "[p]articipation in the program was a 'discretionary benefit,' and [the employer's] non-selection of the plaintiff for the pilot program does not constitute an adverse employment action." *Id.* at *5.

Plaintiffs argue the failure to select them for participation in the MIP in fact constituted an adverse employment action because it "involved *much more* than the receipt or denial of a discretionary bonus" as they were "deprived of the opportunity to change their entire relationships with their employer from one of master and servant in which the servant's sole compensation is in the form of wages or salary, to a partnership in which the former servant shares equity in a common enterprise with its former master."  Pls.' Resp. 95.  In support of this argument, Plaintiffs cite *Hishon v. King & Spalding*, in which the Supreme Court reversed the dismissal of a Title VII claim by a female associate who alleged she had been passed over for partnership.  467 U.S. 69, 72 (1984).  The petitioner argued consideration for partnership was not

---

[7] However, a performance evaluation that results in a denial of an *automatic* monetary benefit may constitute an adverse employment action.  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  In *Russell*, a black employee alleged she was discriminated against because her evaluation was lower than that of a white co-worker, and the size of her bonus "was directly tied to her performance rating; a higher rating would have automatically meant a larger bonus."  257 F.3d at 819.  In finding an adverse employment action had occurred, the court clarified such a performance evaluation would have to *automatically* result in the denial of a bonus to constitute an adverse employment action.  *Id.*

only part of her employment contract, but could also be considered a benefit that was "part and parcel" of an associate's status as an employee at her law firm:  advancement to partnership after apprenticeship was a "matter of course" for associates who received positive performance evaluations; associates regularly expected to be considered for partnership; the firm represented associates were "promoted to partnership 'on a fair and equal basis'"; and the firm explicitly used the prospect of ultimate partnership for recruiting purposes.  *Id.* at 71-72, 76 (explaining further that the prospect of partnership was an important factor in her initial decision to join the firm, and that associates' employment was terminated if they were not selected for partnership). The Supreme Court agreed, holding that if petitioner could prove the allegations at trial, *i.e.,* that partnership consideration was a term, condition or privilege of an associate's employment at the law firm and, therefore, partnership consideration must be without regard to sex, petitioner may be able to show she suffered an adverse employment action.  *Id.*

*Hishon* thus turns on a benefit that is "part and parcel" of an employment relationship – one that is explicitly advertised to attract new recruits, and known to associates at the outset of employment.  Therefore, the opportunity to "make partner" is an expectation and, likely an aspiration for many associates that is, in whole or part, based on performance.  Here, no component of Plaintiffs' employment was impacted as a result of their non-selection for the MIP.  In fact, Cherneski can hardly argue the MIP was an adverse employment action because he admits he did not even know about it until September 2003 – nearly two full years after the MIP was introduced.  Doerr's deposition testimony that it would not surprise him if there were employees who were not selected for the MIP who never became aware of the program's existence is equally telling.  At the very least, an employee must be aware his or her employer has taken an adverse action for there to be a cause of action.  A benefit cannot be said to be "part

15

and parcel" of the employment relationship when the employee is unaware of its existence.   It remains undisputed that, at no point, were Plaintiffs entitled to selection for the MIP.  *See Sicher*, 2011 WL 892746, at *3 (holding "an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled." (citing *Hottenroth,* 388 F.3d at 1033)).  Plaintiffs may have been disappointed when they learned they were not invited to participate in the MIP, but "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).  Although Plaintiffs stress the "sheer amount of money involved in the Plaintiffs' MIP exclusion" is what distinguishes this case from the discretionary bonus cases or performance evaluation cases, the magnitude of the discretionary benefit does not determine whether it is "part and parcel" of the employment relationship.  Moreover, this argument fails to recognize that there was no guarantee of a return on the MIP.   Had the MIP participants lost their investments, Plaintiffs would have been relieved they had not been invited to participate in the MIP in the first place, and it is unlikely they ever would have filed suit.  Tellingly, Plaintiffs filed their claims with the EEOC and PHRA shortly after the "exit" event occurred, and the plan participants received a considerable gain on their investment.

Plaintiffs also argue MG's decision not to select them for the MIP resulted in a significant change in a condition of employment because it caused them to lose stature and influence among their peers.  This assertion is entirely baseless, and Plaintiffs do not cite to a single piece of evidence to support it.  To the contrary, the record demonstrates that each Plaintiff continued to flourish at MG after the MIP was introduced.  In fact, all three Plaintiffs testified they continued to receive salary increases, merit increases, bonuses and/or commissions in the years following the MIP's offering.  In addition, all three men received praiseworthy

16

performance evaluations: Mitchell was touted a "proven performer"; Cherneski noted in his self-evaluation in 2002 that "it goes without saying that I have a great satisfaction in working here" and he was awarded "top sales" in 2004; and Muller testified at his deposition that his performance reviews were "very positive" and he felt "very good" about his performance and the projects he was assigned. Even Andrew Mighton, a "Next Generation" recruit who was invited to participate in the MIP, declared in 2007 that he considered Mitchell and Muller "legendary figures" who were well-respected within the MG community. Mighton Decl. at ¶¶ 12, 34. This can hardly be considered evidence of "lost stature and influence." Consequently, MG's decision not to provide a discretionary benefit to Plaintiffs did not alter the terms or conditions of Plaintiffs' employment and, therefore, cannot support a prima facie case for discrimination.

Alternatively, Plaintiffs argue they have presented direct evidence of age discrimination. Even in a direct evidence case, however, Plaintiffs must establish they were subjected to an adverse employment action. *Connors,* 160 F.3d at 976–77. As already discussed, Plaintiffs have not established this element of their claim.

Plaintiffs would nevertheless still face a "high hurdle" in making out a direct evidence case. *Id.* (citation omitted). There must be evidence "that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); *see also Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994) ("Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] *without inference or presumption.*" (quotation omitted)); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994) ("We have said that the evidence required to come within the *Price Waterhouse* framework must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the

decisionmaking process." (quotation omitted)).

The evidence Plaintiffs characterize as direct evidence of age discrimination is the following: (1) a remark by a regional manager (not a decisionmaker) that the MIP was designed to benefit "Next Generation" recruits; (2) "old age" comments by a regional logistics manager (not a decisionmaker); (3) remarks by Esposito that he, not Harman, made the recommendations for the MIP and that Mitchell was qualified for the MIP, but Esposito believed Mitchell would retire before the program had run its course; and (4) a September 21, 2001 email from MG's General Counsel, James Anderson, indicating MG took morale into consideration in its MIP selection process.

To the extent any of this evidence concerns only Mitchell or Muller, it need not be considered as Mitchell's and Muller's claims are both time-barred, as discussed above. Thus, insofar as the second and third pieces of direct evidence listed above pertain solely to Mitchell and Muller, and not to Cherneski, they do not apply. With respect to the first piece of evidence, it refers to a remark made by an individual who Plaintiffs' concede was not a decisionmaker and, therefore, his remarks are not direct evidence. Evidence of "stray remarks in the workplace" and remarks by "nondecisionmakers" does not shift the burden of proof to defendant. *Price Waterhouse,* 490 U.S. at 277; *see also Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 513–14 (3d Cir.1997). Finally, the fourth piece of evidence, the September 21, 2001, email, is not sufficient to support an inference of discrimination in the MIP selection process. The email states:

> We had our meeting yesterday re participants in the [MIP] and were wondering if it would be possible to expand the group of employees to whom the program is offered from 54 on our original list to approximately 62.  While we do not expect all of these people to elect to participate, we believe that simply offering the opportunity to do so has significant positive employee relations benefits.  Please advise asap.

Although this email was sent by a decisionmaker, there is no evidence Anderson placed "substantial negative reliance" on age. *Price Waterhouse,* 490 U.S. at 277.  More importantly, it is not evidence that Harman, the decisionmaker for the Bulk Products Division, made any decisions relating to the MIP selection process solely based on age.  Therefore, the evidence offered by Plaintiffs is insufficient to support their claims.

Moreover, Plaintiffs have not shown circumstances giving rise to an inference of discrimination.  While the MIP selection process was discretionary within MG, and there was not a checklist such that meeting a proscribed number of items guaranteed an invite, the circumstances of the Plaintiffs' non-selection does not give rise to an inference of unlawful discrimination.  MG has offered detailed description and justification for how Harman reached his decisions for each individual he recommended.  Harman clearly set forth his reasoning why sales representatives were not his focus, explaining they could not contribute to profitability in any meaningful way given the fact their customers were locked into long-term, fixed contracts.

The September 21, 2001, email makes no mention whatsoever of age as a determining factor in selecting candidates for the MIP.  It is therefore insufficient to show Anderson placed "substantial negative reliance" on age, *Price Waterhouse,* 490 U.S. at 277, or, more importantly, that Harman based any of his decisions on age with respect to the MIP selection process for candidates from the Bulk Products Division.  Indeed, of the employees within the Bulk Products Division who were *not* selected by Harman to participate in the MIP, 53% – more than half –

were outside of the protected class. Moreover, individuals within the protected class were selected, while individuals outside of the protected class were not selected. Consequently, there can be no inference of age discrimination. *Tishman v. Associated Press,* No. 05-4278, 2007 WL 4145556, at *5 (S.D.N.Y. Nov. 19, 2007) (holding a reasonable juror could not infer discrimination where almost half of the employees who suffered the same adverse employment action as plaintiffs were outside of the protected class). It is thus clear from the record that MG's selection process was based on reasonable factors other than age. *Smith v. City of Jackson, Miss.* 544 U.S. 228, 241 (U.S. 2005).

In sum, this Court finds that there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law on all of Plaintiffs' age discrimination claims. First, Mitchell's and Muller's claims are time-barred because they failed to file their EEOC charges within the 300-day limitations period. Second, Plaintiffs have failed to prove a prima facie case of unlawful age discrimination because they cannot, as a matter of law, show that MG's denial of its investment opportunity constitutes an adverse employment action. Moreover, Plaintiffs have failed to show circumstances from which a reasonable juror could infer age discrimination. Accordingly, Defendants' motion for summary judgment as to Counts I and III is granted.[8]

Finally, Defendants argues Muller's separate claim for retaliation fails because he has not shown MG acted in retaliation for his filing ADEA charges when it denied him severance

---

[8] Proof of an adverse employment action is required to establish a prima facie case of age discrimination under the ADEA for disparate treatment. *Angelico v. Agilent Techs.*, No. 06-348, 2006 WL 2854377, at *3. Likewise, in a disparate impact claim, a plaintiff challenges an adverse employment action resulting from a facially neutral practice, alleging the practice has a disproportionate impact on the protected class. *Id.* at *6. If a plaintiff has not suffered an adverse employment action, as here, both claims necessarily fail. As a result, it is not necessary to analyze each distinct claim and the purported evidence to support same.

benefits.   To establish a claim for retaliation, a plaintiff must show (1) he was engaged in protected activities; (2) the employer took an adverse employment action after or at the same time as the employee's protected activity; and (3) a causal link exists between the protected activity and the adverse action.   *Glanzman v. Metro. Mgmt. Co.*, 391 F.3d 506, 515-16 (3d Cir. 2004).   An employee engages in protected conduct when he "opposes discrimination on the basis of age."   *Barber v. CSX Distribution Serv.*, 68 F.3d 694, 702 (3d Cir. 1995).

In April through May 2004, MG offered eligible employees a severance package in the event of a Change in Control.   The plan was tailored according to the employees' salary and length of service with MG.   In exchange for the benefits, MG required its eligible employees to sign a General Release and Waiver of Claims, which was set forth in the severance package materials.   Shortly thereafter, on May 12, 2004, Muller filed his claim with the EEOC.   On October 29, 2004, Muller was terminated.[9]   On that date, Muller was notified he was eligible for the severance package provided he signed the General Release and Waiver of Claims.   Rather than signing the Release as it was, Muller edited the agreement so that it carved out his ADEA claims.   Despite requests urging Muller to sign the Release as written, Muller did not.   As a result, MG did not provide him with any severance benefits.

In these circumstances, Muller's retaliation claim fails because MG denied him severance benefits only after he refused to sign the same general Release and Waiver required of all MG employees seeking similar benefits, and Muller therefore cannot show benefits were denied because of his EEOC charge rather than his failure to sign the release.   *DiBiase v. SmithKline Becham Corp.*, 48 F. 3d 719 (3d Cir. 1995) (holding separation benefit plan

---

[9] Muller has no issue with the terms of his termination.

providing enhanced benefits to employees terminated in a Reduction-in-Force which was conditioned upon the signing of a general release (which expressly included waiver of age discrimination claims) did not violate ADEA even though the release did not provide any additional consideration to ADEA-protected workers); *see also Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1508 (10th Cir. 1996) (concluding that the plaintiff failed to prove the causal link required for a retaliation claim, because the defendant employer "required completion of a form waiving all claims against [the employer] from all employees prior to disbursing the [benefits]") (emphasis added); *Grifin v. Kraft Gen. Foods*, 62 F.3d 368 (11th Cir.1995) (rejecting claim that termination plan violated the ADEA where it required employees to execute a general release which explicitly included waiver of ADEA claims before benefits could be received); *Prestileo v. Sears, Roebuck & Co.*, No. 99-2180, 2000 WL 190257, at * 4 (E.D. Pa. Feb. 2, 2000) (holding no evidence of age discrimination where severance package was offered, with its accompanying waiver of legal rights, to all salaried employees, regardless of age, race or sex).[10]

---

[10] Muller argues *EEOC v. Lockheed Martin*, 444 F. Supp. 2d 414 (D. Md. 2006), is controlling on the issue of his retaliation claim. *Lockheed Martin* relies on *Hishon* in finding severance pay to be a benefit that is "part and parcel" of employment relationships. Here, again, this is not the case. Muller was informed of the severance package only months before his termination. His severance package cannot therefore be considered "part and parcel" of his employment relationship with MG. *See EEOC v. SunDance Rehab. Corp.,* 466 F.3d 490 (6th Cir.2006). Moreover, there is no argument that concerning whether the release in *Lockheed Martin* was a uniform general release that was offered to all eligible employees across the board, as the Release was in this case. Finally, the doctrine of *stare decisis* does not compel one district court judge to follow the decision of another. Where a second judge believes that a different result may obtain, independent analysis is appropriate. *See generally Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 (3d Cir. 1991) (internal quotation marks and citation omitted); *Yniguez v. State of Ariz.,* 939 F.2d 727, 736–37 (9th Cir.1991) (noting that district judge's decision is "not even binding on the same judge in a subsequent action"); *United States v. Articles of Drug Consisting of 203 Paper Bags,* 818 F.2d 569, 572 (7th Cir.1987) ("[A single district court decision] is not binding on the circuit, or even on other district judges in the same district."); *Mosel Vitelic Corp. v. Micron Tech., Inc.,* 162 F. Supp.2d

Accordingly, summary judgment in favor of Defendants is appropriate on all of Plaintiffs' claims.[11]  An appropriate order follows.

BY THE COURT:

_/s/ Juan R. Sánchez_____

Juan R. Sánchez, J.

---

307, 311 (D. Del.2000)) ("[W]hile the opinion of one district judge may be found to be persuasive, it is not binding on another district judge (even if that judge happens to sit in the same district).").

In addition, Muller's argument based on the Older Workers Benefit Protection Act, 29 U.S.C. § 626, which imposes specific requirements for releases covering ADEA claims, is not applicable given Muller never signed the release at issue here.

[11] With respect to Plaintiffs' argument that summary judgment is not ripe, this Court finds the record to be plenary given the reasoning of this Court's ruling on this motion.  The material facts regarding the governing statute of limitations issues, the MIP as it pertains to Plaintiffs, and Muller's retaliation claim are all in the record.  Moreover, the cases granting Rule 56(f) motions emphasize the importance of specificity on the part of the non-moving party with respect to both the facts that party expects to uncover through additional discovery and the necessity of those facts to the defense of the motion.  *See, e.g., Hancock Indus. v. Schaeffer,* 811 F.2d 225, 230 (3d Cir. 1987) (holding it is insufficient to state "information is known to us, that simply must be pursued via discovery and deposition before the plaintiffs are in a position to respond"); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 926 (2d Cir.1985) (requiring non-moving party to explain what facts are sought and how those facts are reasonably expected to create genuine issue of material fact); *SEC v. Spence & Green Chem. Co.,* 612 F.2d 896, 901 (5th Cir.1980) (holding that the non-movant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts).  Consequently, Plaintiffs' Motion for Sanctions Based on Spoliation of Evidence (Document 132) is DENIED as moot.